[No. H031127. Sixth Dist. Feb. 19, 2009.]

PATRICIA GONZALEZ ALFARO et al., Plaintiffs and Appellants, v. COMMUNITY HOUSING IMPROVEMENT SYSTEM & PLANNING ASSOCIATION, INC., et al., Defendants and Respondents.

1358

1360

1362

**COUNSEL**

Law Offices of Bruce Tichinin, Inc., and Bruce Tichinin for Plaintiffs and Appellants.

Lombardo & Gilles, Esau Soren Diaz; Noland, Hamerly, Etienne & Hoss, Lloyd W. Lowrey, Jr., Daniel E. Griffee; Charles J. McKee, County Counsel, and Kathryn Reimann, Deputy County Counsel, for Defendants and Respondents.

**OPINION**

**RUSHING, P. J.—**

## I. INTRODUCTION

Plaintiffs are the owners of 23 single-family residences[1] in the Moro Cojo inclusionary housing development projects (sometimes "the Projects") out-

---

[1] The 40 plaintiffs are named individually, *post* (beginning on p. 1366), in the text that summarizes their grant deeds.

We have modified our original opinion to increase the number of plaintiffs. We grant plaintiffs' implicit requests, filed after our original opinion, to augment the record with a reporter's transcript showing that the trial court had consolidated another action with this one and to take judicial notice of another grant deed.

side of Castroville in the County of Monterey. With two exceptions, they obtained their grant deeds directly from either defendant Community Housing Improvement System & Planning Association, Inc. (CHISPA), or defendant South County Housing, Inc. (South County), both nonprofit corporations (sometimes collectively defendants). They acquired their properties through a special program aimed at creating affordable housing for households with very low to moderate incomes. In lieu of a cash downpayment, plaintiffs invested time and labor in helping to build their own residences and those of their neighbors. The Projects were developed subject to a deed restriction that requires the properties to remain affordable to buyers with very low to moderate incomes.

In this lawsuit, plaintiffs claim they were surprised to learn of this deed restriction after they had invested their time and labor. They seek either to invalidate it or to recover damages on a variety of theories, including inadequate recording, unreasonable restraint on alienation, fraudulent nondisclosure of the restriction, breach of an implied contract, waiver and estoppel. After the trial court sustained demurrers to three successive complaints, plaintiffs declined leave to amend their remaining cause of action for constructive fraud, and the trial court dismissed the action. For the reasons stated below, we will dismiss the appeal as to the County of Monterey and will reverse the judgment after concluding that plaintiffs' properties are subject to a valid affordable housing deed restriction, that the statutes of limitations have lapsed as to claims by 24 plaintiffs of fraudulent and negligent nondisclosure and breach of implied contract mostly against CHISPA, and that the same claims by the other 16 plaintiffs against South County remain viable.

## II. The Alleged Facts

On December 20, 1994, the Monterey County Board of Supervisors, by resolution No. 94-524, approved development permits subject to 103 conditions for certain property outside of Castroville. Among those conditions was condition No. 99: "That all the units in the Moro Cojo Inclusionary Housing Development Projects (SH 93001 and SH 93002) be affordable to very low, low and moderate income households as defined in Section 50093 of the California Health and Safety Code." This project included a subdivision including 175 single-family dwellings and a senior housing development. In so doing, the county found "that Northern Monterey County and Castroville, specifically, suffers from an acute need for affordable housing."

Monterey County's approvals of these Projects were challenged in a lawsuit in Monterey County Superior Court (*Alliance to Enforce Mandates v. County of Monterey* (Super. Ct. Monterey County, No. 102344)) that was

settled by agreement filed November 28, 1995. Among the terms of the stipulated judgment was that condition No. 99 "shall be a permanent deed restriction on the project parcels, and shall not be subordinated to any financing, encumbrance, loan, development agreement, contract, lease or other document."

On September 30, 1997, the Monterey County Board of Supervisors, by resolution No. 97-408, accepted the final subdivision map for the Projects. They found, among other things, that condition No. 99 would be implemented by a deed restriction that would be recorded along with the final map.

On October 13, 1997, the owner of the property, CHISPA, on behalf of itself and two limited partnerships, recorded a document (No. 9759925) entitled "DEED RESTRICTION" with the Monterey County Recorder. The restriction referenced resolution No. 94-524 and quoted condition No. 99 as the owner's covenant with the county. The restriction provided that it "shall remain in full force and effect during the period that said permit, or any modification or amendment thereof, remains effective, and during the period that the development authorized by said permit or any modification of said development, remains in existence in or upon any part of, and thereby confers benefit upon, the subject property described herein, and to that extent, said deed restriction is hereby deemed and agreed by owner to be a covenant running with the land, and shall bind owner and all his/her assigns or successors in interest."[2] The subject property was described in an exhibit as "All of Tract No. 1284 of Moro Cojo," with references to the filing date, volume, and page in the Monterey County records. According to plaintiffs, this restriction is perpetual and prevents their heirs from inheriting their properties.

According to a brochure distributed by CHISPA, applicants with low or very low incomes, under Monterey County guidelines, could become homeowners by pooling their efforts and spending 40 hours a week per family for eight to 10 months building their own homes under CHISPA supervision. Specialty work such as plumbing and electrical would be done by professionals. Applicants had to qualify for federal Rural Development loans available under the Rural Housing Service Mutual Self-Help Housing Program.

South County distributed a document dated May 3, 2001, explaining the financing in English and Spanish as follows. The home prices were set at fair

---

[2] Three other documents were recorded on the same date, a deed restriction that required all exterior design changes to be approved by the director of the Monterey County Planning and Building Inspection Department, a deed restriction that required owners to maintain all landscaped areas, and a declaration of covenants, conditions and restrictions of the Moro Cojo inclusionary housing development with a variety of conditions, such as prohibiting cats and requiring low flush toilets and a specified color scheme for the exteriors of the structures.

market value. However, the owners could pay on the following terms. The homeowner made a promissory note to the County of Monterey on which no monthly payments were due so long as the owner was not in default under the terms of the note. The homeowner was to make a one-time payment equal to the amount of a first-time homebuyer program mortgage subsidy within 30 days of the completion of the home. The amount of the note and accrued interest was due on sale or transfer of the home. The county had a first option to purchase the property at fair market value if the owner wished to sell. If the county declined, the homeowner could sell the home to any person. The owner was guaranteed a return on a "sweat equity" downpayment valued at $16,000 plus specified interest, effected, if necessary, by a forgiveness of principal and interest.

At various unspecified dates, plaintiffs all participated in this program to obtain their properties and fully performed their obligations under their contracts. By working with plaintiffs through these programs, defendants created confidential fiduciary relationships and were the managing partners in a joint venture. Defendants did not disclose the existence of the deed restriction to plaintiffs before they invested their time and labor. Plaintiffs were not informed before purchasing their properties that they are required to sell them to "persons meeting unspecified income limits" for prices "well under their current fair market values . . . ."

The preliminary title reports given to all plaintiffs "at the time they purchased their property referred to Covenants, Conditions, and Restrictions, and Deed Restrictions of record, but the references did not describe any limits on the sale value of their properties, or the ability of Plaintiffs to encumber their properties for financing."

CHISPA issued 12 grant deeds to 18 plaintiffs on the following dates: January 31, 2000, Jose and Maria Marin; May 11, 2000, Jennifer Cruz; May 12, 2000, Salvador Sanchez;[3] May 31, 2000, Napolean and Ligaya Ducusin; June 5, 2000, Efrain and Amparo Ochoa;[4] July 12, 2000, Celestino Salazar;[5] July 13, 2000, Juan and Silvia Palacios; July 14, 2000, Lorena Maravilla; July 17, 2000, Estee Hurley; December 6, 2000, Howard Carter; February 12, 2001, Raul and Yolanda Perez; June 19, 2001, Panfilo and Isaura Barbaso.

---

[3] On May 12, 2000, Salvador Sanchez, a married man, obtained a deed as his sole and separate property. The second amended complaint identifies Salvador as a co-owner with Patricia Sanchez.

[4] Presumably Efrain Ochoa is the person designated in the second amended complaint as "Efrain Ocho."

[5] On July 12, 2000, Celestino Salazar and "Maria Guadalupe A. Salazar" obtained a grant deed from CHISPA as husband and wife. The record does not explain whether this Maria is the "Maria A. Melgoza" identified in the second amended complaint as a co-owner with Celestino.

How South County obtained title to property in the Projects is not explained in the record. South County issued 10 grant deeds to 16 plaintiffs on the following dates: February 9, 2000, Jose and Carmen Cervantes, Fermin and Rosario Chavarin, Juventino and Socorro Chavez; February 14, 2000, Jose and Rebecca Pineda; February 15, 2000, Roberto Alfaro, Manuel Castro, Tomas Alfaro;[6] February 22, 2000, Octavio Martinez and Erendira Sanchez; February 28, 2001, Ramiro and Rosario Castillo; May 22, 2001, Claudio Serrato.[7]

Each grant deed from CHISPA stated, "See Attached Exhibit for CC & R Incorporation." The incorporation page referenced the three deed restrictions and the covenants, conditions, and restrictions recorded on October 13, 1997.[8] The grant deeds from South County did not contain this provision, except for the deeds to the Castillos and Claudio Serrato.[9]

---

[6] The grant deed of February 15, 2000, is to "Tomas Alfaro." "Tomas Alfaro" by grant deed dated June 19, 2003, conveyed a joint tenancy interest to his wife "Patricia Alfaro." We assume these are the plaintiffs named "Patricia Gonzalez Alfaro" and "Thomas Alfaro Camacho" in the second amended complaint.

[7] On May 22, 2001, Claudio Serrato, a married man, obtained a grant deed as his sole and separate property. The second amended complaint identifies Lidia Serrato as a co-owner with Claudio.

Plaintiffs Hector Mendoza and Herlinda Rodriguez did not receive a grant deed from South County or CHISPA. They obtained their property by grant deed dated August 20, 2000, from Eladio and Maria Trinidad Hernandez. The Hernandezes received a grant deed from South County dated February 11, 2000.

[8] At the request of CHISPA, the trial court, in sustaining the demurrers to the first amended complaint, took judicial notice of the recorded grant deeds, the three recorded deed restrictions, the covenants, conditions, and restrictions, the county's resolutions, and the settlement agreement filed in litigation challenging the Projects. Accordingly, so do we. (Evid. Code, § 459, subd. (a).)

Evidence Code section 452 authorizes judicial notice to be taken of, among other things:

"(b) Regulations and legislative enactments issued by or under the authority of the United States or any public entity in the United States.

"(c) Official acts of the legislative, executive, and judicial departments of the United States and of any state of the United States.

"(d) Records of (1) any court of this state or (2) any court of record of the United States or of any state of the United States. [¶] . . . [¶]

"(g) Facts and propositions that are of such common knowledge within the territorial jurisdiction of the court that they cannot reasonably be the subject of dispute.

"(h) Facts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy."

These provisions have authorized this court previously to take judicial notice of documents recorded by the county recorder (*B & P Development Corp. v. City of Saratoga* (1986) 185 Cal.App.3d 949, 960 [230 Cal.Rptr. 192]) and resolutions by the county board of supervisors (*Mapstead v. Anchundo* (1998) 63 Cal.App.4th 246, 255, fn. 3 [73 Cal.Rptr.2d 602]).

[9] In other words, the deed restriction was not expressly referenced in South County's deeds to Jose and Carmen Cervantes, Fermin and Rosario Chavarin, Juventino and Socorro Chavez,

This deed restriction breached "an unwritten contract the existence and terms of which were implied from the conduct and the" written brochures distributed by defendants containing the terms that, if plaintiffs contributed their time and labor to construct the homes and assumed the indebtedness necessary to purchase the homes, defendants "would convey to said Plaintiffs title to the homes free of any restriction prohibiting said Plaintiffs from selling their homes at fair market value."

Following receipt of their grant deeds, on February 15, 2000, plaintiffs Pinedas executed a note promising to pay South County $38,190. On July 24, 2000, plaintiff Hurley executed a note promising to pay CHISPA $27,500. On May 22, 2001, plaintiff Claudio Serrato executed a note promising to pay Monterey County $101,270.[10] Each of these notes advises that it contains provisions affecting resales and assumptions. Each note provides that the loan was made to make the residence affordable to the borrower, who is not required to make payments of principal or interest so long as the borrower owns the property.

Plaintiffs were "unsophisticated, first-time homebuyers, a substantial number of whom are not literate in English, which is the only language in which the DEED RESTRICTION is expressed . . . ." They "were ignorant in fact of the DEED RESTRICTION and its effect on the marketability of their homes" until plaintiff Rebecca Pineda attempted to sell her home in April 2004 and was informed by CHISPA of the deed restriction and that she could not sell her property for more than $162,000. Plaintiff "Estee Perez [*sic*]" was told she could not sell her house for more than $149,688, which is less than the total debt against the property. It was then that plaintiffs first discovered "the restraint on their ability to refinance their properties or to resell them at fair market value to any person of their choosing . . . ." Until then, defendants had failed to disclose the effect of the deed restriction.

Defendants have allowed "some Plaintiffs to encumber their properties through refinancing at debt amounts greater than the less-than-market-value to which the DEED RESTRICTION purportedly limits resale value . . . ."

### III. PROCEDURAL HISTORY

On August 5, 2005, plaintiffs filed a complaint, naming as defendants CHISPA, South County, and the County of Monterey. After a hearing on November 18, 2005, on December 12, 2005, the trial court sustained the

Roberto Alfaro, Jose and Rebecca Pineda, Tomas Alfaro, Manuel Castro, or Octavio Martinez and Erendira Sanchez, and indirectly to Hector Mendoza and Herlinda Rodriguez.

[10] On March 19, 2008, we granted plaintiffs' unopposed request to take judicial notice of these three promissory notes.

demurrers by all defendants with leave to amend and granted a motion by South County to strike part of the complaint.

A new attorney for plaintiffs filed a 23-page first amended complaint. After a hearing on May 26, 2006, on July 14, 2006, the trial court sustained the demurrers by all defendants to plaintiffs' first seven causes of action without leave to amend, and sustained the demurrers to the remaining four causes of action with leave to amend. The formal order filed August 4, 2006, sustained the demurrers of all defendants, and dismissed the first amended complaint against Monterey County in its entirety with prejudice. A notice of entry of this ruling was served on plaintiffs on August 14, 2006. No appeal was filed from this order.

Plaintiffs filed a 27-page second amended complaint, dropping the County of Monterey as a defendant. After a hearing on October 20, 2006, on November 9, 2006, the trial court granted defendants' requests for judicial notice and sustained the remaining defendants' demurrers to plaintiffs' first 10 causes of action without leave to amend and dismissed these causes of action with prejudice in favor of CHISPA and South County. The court granted plaintiffs leave to amend their claim for constructive fraud. A notice of entry of this order was filed on November 16, 2006. Because plaintiffs did not amend their complaint in time, on January 19, 2007, the action was dismissed with prejudice. On January 10, 2007, plaintiffs filed a notice of appeal from a purported judgment of dismissal on November 16, 2006. On January 26, 2007, an amended notice of appeal designated the order of dismissal as filed on January 19, 2007.

## IV. THE APPEAL AS TO MONTEREY COUNTY

On September 18, 2007, the County of Monterey filed a motion to dismiss this appeal as not filed within the time allotted by rule 8.104 of the California Rules of Court. This court initially suspended briefing in light of this motion, and, on March 19, 2008, we deferred the motion for consideration along with the appeal.

The order filed August 4, 2006, dismissed the first amended complaint with prejudice against Monterey County as a defendant, while granting plaintiffs leave to amend some causes of action against CHISPA and South County. When a trial court's ruling on a demurrer leaves one or more causes of action pending or subject to amendment between two parties, that ruling is not appealable by those parties. (*Turpin v. Sortini* (1982) 31 Cal.3d 220, 224–225, fn. 3 [182 Cal.Rptr. 337, 643 P.2d 954]; *North American Chemical*

*Co. v. Superior Court* (1997) 59 Cal.App.4th 764, 773 [69 Cal.Rptr.2d 466]; *County of Santa Clara v. Atlantic Richfield Co.* (2006) 137 Cal.App.4th 292, 312 [40 Cal.Rptr.3d 313].) On the other hand, "[a]n order dismissing fewer than all defendants from an action is a 'final judgment' as to them, and is thus appealable." (*Hydrotech Systems, Ltd. v. Oasis Waterpark* (1991) 52 Cal.3d 988, 993, fn. 3 [277 Cal.Rptr. 517, 803 P.2d 370]; cf. *Seidner v. 1551 Greenfield Owners Assn.* (1980) 108 Cal.App.3d 895, 901–902 [166 Cal.Rptr. 803]; *Desai v. Farmers Ins. Exchange* (1996) 47 Cal.App.4th 1110, 1115 [55 Cal.Rptr.2d 276]; cf. Code Civ. Proc., §§ 581, subd. (f)(1), 581d.)

Plaintiffs recognize this general rule, but seek to apply the following exception. "Because of the nature of the principal/surety relationship, the courts have carved out a special rule for cases involving sureties and other parties having a unity of interest. The rule is that when one party to a judgment has a unity of interest with another party whose rights are not determined by the judgment, no appeal lies until the rights or duties of the interested party have been resolved by a final judgment." (*T&R Painting Construction, Inc. v. St. Paul Fire & Marine Ins. Co.* (1994) 23 Cal.App.4th 738, 743 [29 Cal.Rptr.2d 199], and cases cited.) We see no allegation in the first amended complaint that Monterey County was in a principal-surety relationship with the other two defendants. The exception by its terms is inapplicable.[11]

■ Plaintiffs assert that they dropped Monterey County as a defendant from the second amended complaint in order to comply with the court's ruling on the demurrers to the first amended complaint, but they did not intend, by this pleading amendment, to waive their right to appeal from the August 4, 2006 order. It is not this pleading amendment that bars plaintiffs' appeal from this order, but their failure to file a timely appeal from that order. "Upon an appeal" from an appealable order or judgment, "the reviewing court may review . . . any intermediate ruling, proceeding, order or decision . . ." (Code Civ. Proc., § 906[12]; cf. *County of Santa Clara v. Atlantic Richfield Co., supra*, 137 Cal.App.4th 292, 312), but it may not review an

---

[11] Plaintiffs also argue that "[t]his case is much like this Court's case of *Steen v. Fremont Cemetery [Corp.]* (1992) 9 Cal.App.4th 1221 [11 Cal.Rptr.2d 780] . . . ." We disagree. Simply describing that opinion reveals its irrelevance to an order dismissing a party from an action.

In that class action case alleging wrongful cremation practices, one issue was the appealability of an order directing the defendant to turn over the names of its decedents to facilitate notice to the class. We concluded that the order was neither a final judgment nor an appealable collateral order. (*Steen v. Fremont Cemetery Corp., supra*, 9 Cal.App.4th at p. 1230.)

[12] Code of Civil Procedure section 906 provides in part: "Upon an appeal pursuant to Section 904.1 or 904.2, the reviewing court may review the verdict or decision and any intermediate ruling, proceeding, order or decision which involves the merits or necessarily affects the judgment or order appealed from or which substantially affects the rights of a party . . . . The respondent, or party in whose favor the judgment was given, may, without appealing from such judgment, request the reviewing court to and it may review any of the

earlier appealable ruling. (*Berge v. International Harvester Co.* (1983) 142 Cal.App.3d 152, 158 [190 Cal.Rptr. 815]; *Morrissey v. City and County of San Francisco* (1977) 75 Cal.App.3d 903, 906 [142 Cal.Rptr. 527].)

Because plaintiffs have not yet filed a notice of appeal from this earlier ruling, there is no issue before us concerning any potential liability of Monterey County. We will grant the county's motion to dismiss the appeal as to it. In light of this conclusion, we do not consider whether plaintiffs should have exhausted their administrative remedies.

## V. THE STANDARD OF REVIEW OF GENERAL DEMURRERS

California law requires a complaint in a civil action to contain both "(1) [a] statement of the facts constituting the cause of action, in ordinary and concise language" and "(2) [a] demand for judgment for the relief to which the pleader claims to be entitled. If the recovery of money or damages is demanded, the amount demanded shall be stated." (Code Civ. Proc., § 425.10, subd. (a).) What is necessary to state a cause of action are the facts warranting legal relief, and not whether a plaintiff has provided apt, inapt, or no labels or titles for causes of action. (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 38–39 [77 Cal.Rptr.2d 709, 960 P.2d 513]; *Lee Newman, M.D., Inc. v. Wells Fargo Bank* (2001) 87 Cal.App.4th 73, 78–79 [104 Cal.Rptr.2d 310]; *Saunders v. Cariss* (1990) 224 Cal.App.3d 905, 908 [274 Cal.Rptr. 186].)

A general demurrer is a trial of a pure issue of law and "presents the same question to the appellate court as to the trial court, namely, whether the plaintiff has alleged sufficient facts to justify any relief, notwithstanding superfluous allegations or claims for unjustified relief. [Citations.] '[T]he allegations of the complaint must be liberally construed with a view to attaining substantial justice among the parties. (Code Civ. Proc., § 452.)' [Citation.] Pleading defects which do not affect substantial rights of the parties should be disregarded. (Code Civ. Proc., § 475; [citation].)

"In evaluating a demurrer, we assume the truth of all material facts properly pleaded in the complaint unless they are contradicted by facts judicially noticed (Code Civ. Proc., §§ 430.30, subd. (a), 430.70; [citation]) but no such credit is given to pleaded contentions or legal conclusions. [Citations.] Specific factual allegations modify and limit inconsistent general statements." (*B & P Development Corp. v. City of Saratoga, supra,* 185 Cal.App.3d 949, 952–953.)

---

foregoing matters for the purpose of determining whether or not the appellant was prejudiced by the error or errors upon which he relies for reversal or modification of the judgment from which the appeal is taken."

An amended complaint may be regarded as superseding the original complaint in some situations (*Singhania v. Uttarwar* (2006) 136 Cal.App.4th 416, 425 [38 Cal.Rptr.3d 861]), such as when the plaintiff elects to amend a cause of action to which a demurrer is sustained. (See *County of Santa Clara v. Atlantic Richfield Co., supra*, 137 Cal.App.4th 292, 312.) "Although ordinarily an appellate court will not consider the allegations of a superseded complaint [citation], that rule does not apply when the trial court denied plaintiffs leave to include those allegations in an amended complaint." (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 209 [197 Cal.Rptr. 783, 673 P.2d 660], superseded by statute on another ground as stated in *Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 227 [46 Cal.Rptr.3d 57, 138 P.3d 207].) When plaintiffs decline to amend a complaint, as this court has explained, they have "clearly elected to stand on the second amended complaint with respect to that cause of action and may challenge the court's ruling on that cause of action on an appeal from the subsequent dismissal of their action." (*County of Santa Clara v. Atlantic Richfield Co., supra*, 137 Cal.App.4th at p. 312.) When plaintiffs decline an invitation to amend a cause of action, on appeal we assume that the complaint contains their strongest statement of that cause of action. (*Reynolds v. Bement* (2005) 36 Cal.4th 1075, 1091 [32 Cal.Rptr.3d 483, 116 P.3d 1162].)

## VI. The Effect of Recording the Deed Restriction

It is increasingly common for developers of residential subdivisions to impose restrictive conditions on the incoming residents of the subdivision in an attempt to enhance their enjoyment of their homes and to maintain or increase property values. (E.g., *Zabrucky v. McAdams* (2005) 129 Cal.App.4th 618, 623–624 [28 Cal.Rptr.3d 592]; *Dolan-King v. Rancho Santa Fe Assn.* (2000) 81 Cal.App.4th 965, 976 [97 Cal.Rptr.2d 280].) In 1995, the California Supreme Court resolved some confusion in California law and described how to impose effective restrictive covenants. "[I]f a declaration establishing a common plan for the ownership of property in a subdivision and containing restrictions upon the use of the property as part of the common plan is recorded before the execution of the contract of sale, describes the property it is to govern, and states that it is to bind all purchasers and their successors, subsequent purchasers who have constructive notice of the recorded declaration are deemed to intend and agree to be bound by, and to accept the benefits of, the common plan; the restrictions, therefore, are not unenforceable merely because they are not *additionally* cited in a deed or other document at the time of the sale." (*Citizens for Covenant Compliance v. Anderson* (1995) 12 Cal.4th 345, 349 [47 Cal.Rptr.2d 898, 906 P.2d 1314] (*Anderson*).) This rule applies to both equitable servitudes and covenants running with the land. (*Id.* at p. 355.)

In reaching this conclusion, the court observed, among other things: " '[R]unning covenants generally enhance alienability, and therefore many authorities feel that they should be encouraged.' " (*Anderson, supra*, 12 Cal.4th at p. 364.) The " 'financial viability of the community depends on continued covenant compliance . . . .' " (*Ibid.*) "Having a single set of recorded restrictions that apply to the entire subdivision would also no doubt fulfill the intent, expectations, and wishes of the parties and community as a whole." (*Ibid.*)

■ *Anderson, supra*, 12 Cal.4th at page 355 explained: "By statute, any instrument 'affecting the title to . . . real property may be recorded' by the 'county recorder of the county in which the real property affected thereby is situated.' (Gov. Code, § 27280, subd. (a); Civ. Code § 1169.) . . . Civil Code section 1213 provides that every 'conveyance' of real property recorded as prescribed by law provides 'constructive notice' of its contents to subsequent purchasers. The term 'conveyance' is broadly defined to include '*every instrument* in writing . . . by which the title to any real property *may be affected* . . . .' (Civ. Code, § 1215, italics added.)"

In our case, a deed restriction was recorded on October 13, 1997, that was intended to require all the units in the Projects to be affordable to very low, low and moderate income households as defined in Health and Safety Code section 50093.[13] This deed was recorded well before plaintiffs obtained their grant deeds, and inferentially before they entered into contracts to acquire their residences.

■ Plaintiffs seek to avoid the impact of *Anderson* by arguing that the decision is limited to "use restrictions" and does not apply to restraints on alienation. They assert that the *Anderson* rule was intended to enhance alienability of property, not restrict it. It has been said, "Equity will not enforce any restrictive covenant that violates public policy." (*Nahrstedt v. Lakeside Village Condominium Assn.* (1994) 8 Cal.4th 361, 381 [33 Cal.Rptr.2d 63, 878 P.2d 1275].)

Plaintiffs overlook the very public policy that benefitted them. The California Legislature has found and declared "that it is to the economic benefit of the state and a public purpose to encourage the availability of adequate housing and home finance for persons and families of low or moderate income, and to develop viable urban and rural communities by providing decent housing, enhanced living environment, and increased economic opportunities for persons and families of low or moderate income." (Health & Saf. Code,

---

[13] It is pointless to prolong this opinion with a quotation of the almost 700 words in Health and Safety Code section 50093. It is safe to assume that the statute contains detailed definitions of " '[p]ersons and families of low or moderate income,' " " '[p]ersons and families of low income,' " and " '[p]ersons and families of moderate income.' "

§ 50004; cf. Health & Saf. Code, § 50003; Gov. Code, former § 11011.9, subd. (a)(2), (3), §§ 54220, subd. (a), 54235, 65913.) Local governments are required to include provisions for such housing in their general plans. (Gov. Code, §§ 65588, 65583, subds. (a)(1), (c)(2).) "[T]he court found . . . that a valid public purpose was served by encouraging the construction of moderate and low-income housing projects." (*California Housing Finance Agency v. Elliott* (1976) 17 Cal.3d 575, 584 [131 Cal.Rptr. 361, 551 P.2d 1193], discussing *Winkelman v. City of Tiburon* (1973) 32 Cal.App.3d 834 [108 Cal.Rptr. 415] with approval.) Rent control also has been recognized as "protecting the public interest in having affordable and properly maintained rental housing available to the citizens of the community." (*Cotati Alliance for Better Housing v. City of Cotati* (1983) 148 Cal.App.3d 280, 296 [195 Cal.Rptr. 825]; cf. *Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 676 [209 Cal.Rptr. 682, 693 P.2d 261].)

While a number of the covenants, conditions, and restrictions applicable to the Projects were intended to increase the residents' enjoyment of their homes and to maintain the value of their properties, there is no doubt that committing the properties to continued affordability by very low to moderate income buyers will tend to depress their market value. However, such a restriction serves the public policy of providing adequate housing for such citizens. To the extent that depressing the market value of a property inhibits its sale or alienation, such a restriction is necessary to ensure that the property remains affordable to the poor who were and are the intended beneficiaries of the Projects. It has the same impact as rent control. We perceive no hostility in the reasoning of *Anderson* to creating a covenant or servitude in service of this policy.

We will discuss more fully in the next part whether the deed restriction is an unreasonable restraint on alienation. We conclude here that the rule of *Anderson* applies to the deed restriction recorded in this case, which was obviously intended to implement a common plan of maintaining the affordability of the Projects for low- and moderate-income persons who wish to follow in plaintiffs' footsteps. Its recording provided constructive notice to subsequent purchasers, including plaintiffs, that their properties, if sold, had to be affordable to persons of very low to moderate incomes.

Government Code section 27281.5, subdivision (a) states requirements for giving effect to governmental restrictions on conveying real property: "Any restriction imposed upon real property on or after January 1, 1982, which restricts . . . the ability of the owner of real property to convey the real property . . . and which is imposed by a municipal or governmental entity on real property . . . which is not owned by the municipal or governmental entity, shall be specifically set forth in a recorded document which particularly describes the real property restricted in order to impart constructive

notice of the restriction, or shall be referenced in a recorded document which particularly describes the real property restricted and which refers by page and book number to a separately recorded document in which the restriction is set forth in full."[14]

Plaintiffs' first purported cause of action in their first amended complaint attempted to allege that the grant deeds by CHISPA and South County violated this statute in several ways. Plaintiffs now concede "that the deeds of CHISPA meet the requirements for the second alternative means of compliance for [Government Code section] 27281.5 in that the deeds 'refer by page and book number to a separately recorded document in which the restriction is set forth in full . . . .' " They also concede that their pleading inaccurately identified the defects in South County's grant deeds, and they request leave to amend.

■ It is true that most of the South County grant deeds (except the last two in time) made no specific reference to the recorded deed restriction of October 13, 1997. However, this omission does not invalidate the restriction so long as the recorded deed restriction itself "particularly describes the real property restricted in order to impart constructive notice of the restriction." Plaintiffs assert that the deed restriction "does not give the required 'particular' description of the individual Lots to which it applies, but only the general description of the Tract Map . . . as 'All of Tract No. 1284 . . . .' " When a deed restriction is generally applicable to a subdivision, we do not believe that this statute requires the deed to set out specific descriptions of every lot within the subdivision. In this case the deed would have had to describe at least 175 separate lots. It is settled that a deed can incorporate the description of property in a map or other document by sufficiently specific reference. (*McCullough v. Olds* (1895) 108 Cal. 529, 531–532 [41 P. 420]; *Calvi v.*

---

[14] The full text of Government Code section 27281.5 follows. "(a) Any restriction imposed upon real property on or after January 1, 1982, which restricts either the ability of the owner of real property to convey the real property or the owner of a proprietary leasehold interest to convey such interest and which is imposed by a municipal or governmental entity on real property or a proprietary leasehold interest which is not owned by the municipal or governmental entity, shall be specifically set forth in a recorded document which particularly describes the real property restricted in order to impart constructive notice of the restriction, or shall be referenced in a recorded document which particularly describes the real property restricted and which refers by page and book number to a separately recorded document in which the restriction is set forth in full.

"(b) Any restriction on the ability of a person to convey real property which is subject to subdivision (a) shall be valid and enforceable only when the requirements contained in subdivision (a) have been met.

"(c) Nothing in this section shall be construed, either directly or by implication, to enhance, diminish, or authorize any municipal or governmental entity to impose a restriction on the ability of a person to convey real property or a proprietary leasehold interest."

*Bittner* (1961) 198 Cal.App.2d 312, 316 [17 Cal.Rptr. 850]; *Kapner v. Meadowlark Ranch Assn.* (2004) 116 Cal.App.4th 1182, 1187 [11 Cal.Rptr.3d 138] (*Kapner*).)

Civil Code section 1468, subdivision (a) provides that a covenant does not run with the land unless the lands to be burdened and benefitted "are particularly described in the instrument containing such covenants." In *Kapner, supra*, 116 Cal.App.4th 1182, a property owner argued that his parcel was not particularly described in protective covenants and restrictions that applied to the entire ranch of which his property was a part. The appellate court concluded: "By describing the entire ranch, the rerecorded PC&R's particularly describe all of the land benefited and burdened by the fifth amendment. That is all that is necessary. Anyone searching the title to Kapner's parcel would realize that his parcel is part of the land that is particularly described as being encumbered by the amended PC&R's." (*Id.* at p. 1188.) We reach the same conclusion. The deed restriction here particularly described all the property that is subject to it in compliance with Government Code section 27281.5, subdivision (a). Plaintiffs have no prospect of amending their complaint to allege a violation of this statute.

## VII. The Restriction Is a Reasonable Restraint on Alienation

The purported third and fourth causes of action of the first amended complaint challenged the deed restriction as a void restraint on alienation.

Civil Code section 711 provides, "Conditions restraining alienation, when repugnant to the interest created, are void." *City of Oceanside v. McKenna* (1989) 215 Cal.App.3d 1420 [264 Cal.Rptr. 275] (*McKenna*) explained, " ' "The day has long since passed when the rule in California was that all restraints on alienation were unlawful under the statute; it is now the settled law in this jurisdiction that only unreasonable restraints on alienation are invalid." [Citation.]' " (*Id.* at p. 1427, quoting *Martin v. Villa Roma, Inc.* (1982) 131 Cal.App.3d 632, 635 [182 Cal.Rptr. 382], quoting *Laguna Royale Owners Assn. v. Darger* (1981) 119 Cal.App.3d 670, 682 [174 Cal.Rptr. 136].)

"In determining whether a restraint on alienation is unreasonable, the court must balance the justification for the restriction against the quantum of the restraint. The greater the restraint, the stronger the justification must be to support it." (*McKenna, supra*, 215 Cal.App.3d at p. 1427.) In *McKenna*, the City of Oceanside sold property to a developer at a below market price subject to a set of covenants, conditions, and restrictions that, among other things, bound the developer and its successors in interest for 10 years and

prohibited any owner from "renting or leasing the property at any time for any reason. The CC&Rs also include eligibility requirements for initial and subsequent purchasers of the units and provisions for prescreening of prospective purchasers by the Commission. The CC&Rs were designed to assure the continued affordability of the condominiums and to foster an owner-occupied environment in the redevelopment area." (*Id.* at p. 1423.)

As the court explained, "the City and the Commission subsidized the construction of Sea Village at a cost of more than $1 million in public funds to provide affordable housing to low and moderate income persons and to foster an owner-occupied community in the redevelopment area." (*McKenna, supra,* 215 Cal.App.3d at p. 1429.) "[T]he disputed restrictions clearly and directly are related to the stated purposes of maintaining a stabilized community of low and moderate income residents and discouraging speculation by real estate investors. [¶] Certainly, the provision of housing for low and moderate income persons is in keeping with the public policy of this state." (*Id.* at p. 1427.) Under prior precedent, "the enforceability of the restriction depends on whether the restriction is reasonable. Whether a restriction is reasonable will depend upon the particular circumstances of the case." (*Id.* at p. 1430.) The court concluded: "[T]he restrictions support rather than offend the policies of this state. Given this factor and the fact they clearly and directly are related to the legitimate purposes for which the Sea Village condominium project was established, we find as a matter of law they are reasonable." (*Id.* at p. 1428, fn. omitted.)

Plaintiffs criticize *McKenna* for not applying the very balancing test it articulated. Plaintiffs acknowledge that "the policy of assuring low cost housing" is "very important," but they argue that it is outweighed by the consequences of enforcing the deed restriction, which include discouraging plaintiffs from maintaining and improving their properties and forfeiting the "otherwise naturally-occurring increase in equity from rising market value that is the main right of value in real property title ownership."

Plaintiffs are essentially arguing that this housing program should have been designed differently, namely just to benefit them, the first wave of low-income buyers. We acknowledge that it would be a more beneficial program to this first wave if they were able to sell their properties for whatever price they could command. However, plaintiffs do not discuss how avoiding the affordable housing deed restriction will benefit the second wave and later waves of low-income buyers. There is an inherent conflict between the goals of maximizing the financial benefits to the first wave and preserving

affordable housing for future buyers. We consider it reasonable to impose a continuing affordability requirement for the benefit of future low to moderate income homeowners. It is our duty to interpret the deed restriction "in a way that is both reasonable and carries out the intended purpose of the contract." (*Dieckmeyer v. Redevelopment Agency of Huntington Beach* (2005) 127 Cal.App.4th 248, 259 [24 Cal.Rptr.3d 895] (*Dieckmeyer*).)

A similar policy argument was rejected in *Dieckmeyer, supra,* 127 Cal.App.4th 248, a case not cited by the parties. There a buyer of low-income housing sought to prepay the promissory note she executed and to eliminate the equity share retained by the City of Huntington Beach and its redevelopment agency. Under that program, the condominium was sold subject to covenants, conditions, and restrictions requiring that all subsequent buyers " 'qualify as low, very low or moderate income households' " and that no property be sold, leased, or transferred without the city's written approval. (*Id.* at p. 251.) The loan agreement also created an equity share in the city equal to a percentage of the profit on any sale that was due on several conditions, including a sale to a nonqualified buyer, but not to a sale to a qualified buyer approved by the city who assumed the loan. (*Id.* at pp. 251–252.)

Dieckmeyer argued "that imposing the equity share after prepayment violates a legislative intent to expand housing opportunities for people of all economic levels, because it would deny her profits she could use to buy a better home." (*Dieckmeyer, supra,* 127 Cal.App.4th at p. 257.) The court rejected this contention as follows. "Dieckmeyer claims that holding her to the equity share denies lower income earners the opportunity to improve their financial condition, stifles housing opportunity because she cannot buy a better home, and would force her to 'forfeit the American dream of home ownership if she relocates.' Hyperbole aside, what Dieckmeyer is trying to do is get out of a contract in order to make more money. As we have said, if Dieckmeyer did not like the deal, she should not have taken it. Having enjoyed the benefits of owning a home through the affordable housing program, she cannot now reject its obligations." (*Id.* at pp. 257–258.)

■ Plaintiffs criticize the deed restriction here as "perpetual in duration" and purporting "to prohibit inheritance by the heirs of Plaintiffs." We see nothing in the deed restriction attached to the complaint that prohibits inheritance. As we have explained before in reading a complaint, "a general description of an exhibit attached to a complaint will be disregarded where inconsistent with the exhibit. [Citations.]" (*B & P Development Corp. v. City of Saratoga, supra,* 185 Cal.App.3d 949, 953.) The covenant itself provides that it is binding on the assigns and successors in interest of the original owner. This would seem to apply to the heirs of an owner.

We do not see a perpetual restriction in the deed either. It remains effective while the "development authorized by said permit or any modification of said development, remains in existence in or upon any part of, and thereby confers benefit upon, the subject property described herein." We understand this to say that it remains effective while it is beneficial. Presumably when there is no further need for affordable housing for low-income households, the restriction will lose effect. Our interpretation of this restriction is not influenced by its characterization as perpetual in a letter by attorneys for CHISPA dated September 8, 2005, which is incorporated by reference into the first amended complaint. What is of concern to us is the actual wording of the deed restriction, not its characterization by plaintiffs or defendants.

In any event, a similar restriction of indefinite duration was upheld as a reasonable restraint on alienation in *Martin v. Villa Roma, Inc., supra,* 131 Cal.App.3d 632, 633, 635. We conclude that this deed restriction, which ensures that residential property will remain affordable to very low-, low-, and moderate-income households so long as such a restriction is beneficial, is a reasonable restraint on alienation.

Plaintiffs call the deed restriction not only unreasonable, but unintelligible in the purported second cause of action in the first amended complaint. What plaintiffs seem to have in mind is that an agreement, including a deed, "cannot be specifically enforced . . . [¶] . . . [¶] . . . the terms of which are not sufficiently certain to make the precise act which is to be done clearly ascertainable." (Civ. Code, § 3390, subd. 5.) They rely on *Saterstrom v. Glick Bros. Sash etc. Co.* (1931) 118 Cal.App. 379 [5 P.2d 21], which concluded, "The deed of trust being void for lack of a sufficient description of the property conveyed, the sale and all proceedings under the deed of trust would likewise be wholly ineffective and void." (*Id.* at p. 383.) That was a case to quiet title in which the appellate court set aside the sale of a property.

Plaintiffs do not seek to rescind their own grant deeds, just the deed restriction mentioned in some of the deeds. Plaintiffs assert it is uncertain which of their properties must be sold to very low-income households, which to low-income households, and which to moderate-income households. The deed restriction provides that "all the units in the [Projects] be affordable to very low, low and moderate income households." It does not attempt to segregate the units into three separate categories. We see nothing uncertain about this phrase. "And" does not mean "or." Each unit must be affordable to a very low-income household, though it would not violate the deed to sell it to a qualified moderate-income household.

## VIII. WAIVER AND ESTOPPEL

The first amended complaint alleged that defendants allowed "several of Plaintiffs to refinance their properties so as to encumber the title with debt in excess of" sale prices affordable to buyers with low to moderate incomes. Defendants thereby have implicitly waived the deed restriction (sixth cause of action) and are estopped to enforce the deed restriction as to those plaintiffs who were allowed to refinance (seventh cause of action). Plaintiffs argue that their excessive refinancing "will make it impossible as a practical matter to sell these properties to persons" with low income.

 The right to enforce a restrictive covenant may be deemed generally waived when there are "a sufficient number of waivers so that the purpose of the general plan is undermined," in other words, when "substantially all of the landowners have acquiesced in a violation so as to indicate an abandonment." (*Kapner, supra*, 116 Cal.App.4th 1182, 1189–1190.) Plaintiffs here collectively own 22 of 175 single-family residences. A nebulous allegation that "several" of them have been allowed to refinance is clearly insufficient to establish that defendants have generally waived their right to enforce the restrictive covenant, even if the restrictive covenant is understood to prohibit refinancing.

As CHISPA points out, there is nothing in the deed restriction that prohibits plaintiffs from refinancing. They are bound to sell their homes at affordable prices, but there is no prohibition against them transforming their "sweat equity" into real cash without selling their homes.[15] It was not a violation of the restriction for "several" plaintiffs to find lenders who were willing to make loans in excess of the value of the property. If these transactions make it undesirable or impracticable for plaintiffs to sell their homes, they can retain ownership until market values rise or they pay down their loans.

To support their claim that the deed restriction prohibits refinancing, plaintiffs cite a provision in the settlement agreement in the prior action that the deed restriction is permanent and "*shall not be subordinated to any financing* . . . ." (Italics & underscoring added.) What this judgment prohibits is subordination, not refinancing. Plaintiffs have not alleged that their refinancing attempted to subordinate the deed restriction.

 Because we do not understand the deed restriction to prohibit refinancing, we also do not understand the allegation in the first amended

---

[15] We note that the three promissory notes each contain several provisions for the borrower encumbering the residence with another deed of trust.

complaint that defendants, by "allowing such refinancing . . . impliedly represented to such Plaintiffs that the DEED RESTRICTION was inapplicable as to such Plaintiffs . . . ." Among the elements of estoppel is that the party asserting it must be ignorant of the true facts and must reasonably rely on the other party's conduct to his detriment. (*Berkeley Police Assn. v. City of Berkeley* (1977) 76 Cal.App.3d 931, 938–939 [143 Cal.Rptr. 255]; *Feduniak v. California Coastal Com.* (2007) 148 Cal.App.4th 1346, 1369 [56 Cal.Rptr.3d 591].) Allowing plaintiffs to do what was not prohibited by the deed restriction cannot bar defendants from enforcing the restriction. We discuss more fully in the next section whether those unnamed plaintiffs who refinanced can claim to be ignorant of the true facts at the time of their refinancing.

## IX. ALLEGED CONCEALMENT AND FAILURE TO DISCLOSE

The second amended complaint alleged that defendants, as sellers of realty and as fiduciaries by virtue of their relationships with plaintiffs, breached an obligation to disclose a fact materially affecting the value of the property, namely the deed restriction, until the restriction was referenced in the grant deeds by CHISPA (sixth cause of action) and South County (seventh cause of action) after plaintiffs had invested their time and labor.[16] Further, defendants intentionally concealed this fact. The eighth cause of action (against CHISPA) and the ninth (against South County)[17] alleged fraudulent suppression.[18]

Unlike the causes of action alleging nondisclosure, the causes of action alleging concealment do not acknowledge that the deed restrictions were referenced in many grant deeds. However, we are entitled to accept that as a fact. A plaintiff may plead inconsistent counts or causes of action in a verified complaint, but this rule does not entitle a party to describe the same transaction as including contradictory or antagonistic facts. (*Faulkner v. California Toll Bridge Authority* (1953) 40 Cal.2d 317, 328 [253 P.2d 659];

---

[16] As noted above, the affordable housing deed restriction was referenced in each grant deed from CHISPA and in two (to Castillos and Serrato) from South County.

[17] The second amended complaint also purports to assert a 10th cause of action as an alternative to the ninth cause of action against South County. This allegation is that South County negligently failed to disclose the deed restriction due to its ignorance of the restriction. As plaintiffs' fiduciary, South County had a duty to learn of this restriction. As we proceed to explain, nondisclosure by a fiduciary has been regarded as fraud, so we do not further analyze this 10th cause of action separately.

[18] We note that plaintiffs in the first amended complaint also attempted to allege causes of action for intentional (10th cause of action) and negligent misrepresentations (11th cause of action) by defendants. The trial court sustained demurrers to these causes of action with leave to amend, finding that "[p]laintiffs have failed to allege with specificity their fraud causes of action. The court is unable to tell, among the 38 plaintiffs and three defendants, who said what, to whom, and when." Plaintiffs have apparently abandoned these claims in their second amended complaint.

cf. *Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC* (2008) 162 Cal.App.4th 858, 886 [76 Cal.Rptr.3d 325].) In such circumstances, we may accept as true the more specific allegations. (*Faulkner v. California Toll Bridge Authority, supra,* 40 Cal.2d at pp. 328–329.) In addition, "[a] court may take judicial notice of something that cannot reasonably be controverted [such as a recorded deed], even if it negates an express allegation of the pleading." (*Poseidon Development, Inc. v. Woodland Lane Estates, LLC* (2007) 152 Cal.App.4th 1106, 1117 [62 Cal.Rptr.3d 59].)

A claim of fraud based on mere nondisclosure may arise when there is a confidential relationship,[19] when the defendant has made a representation that is likely to mislead absent a disclosure, when there is active concealment of the undisclosed matter, or "when one party to a transaction has sole knowledge or access to material facts and knows that such facts are not known to or reasonably discoverable by the other party." (*Goodman v. Kennedy* (1976) 18 Cal.3d 335, 347 [134 Cal.Rptr. 375, 556 P.2d 737].) A seller of real property has a common law duty to disclose "where the seller knows of facts materially affecting the value or desirability of the property which are known or accessible only to him and also knows that such facts are not known to, or within the reach of the diligent attention and observation of the buyer . . . ." (*Lingsch v. Savage* (1963) 213 Cal.App.2d 729, 735 [29 Cal.Rptr. 201]; see *Reed v. King* (1983) 145 Cal.App.3d 261, 265 [193 Cal.Rptr. 130].) There is a statutory duty to disclose deed restrictions in a real

---

[19] "Constructive fraud consists: [¶] 1. In any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or any one claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him . . . ." (Civ. Code, § 1573.) "[T]here is no clear line establishing when a fiduciary's breach of the duty of care [and disclosure] will be merely negligent and when it may be characterized as constructive fraud. However, a breach of a fiduciary duty *usually* constitutes constructive fraud." (*Salahutdin v. Valley of California, Inc.* (1994) 24 Cal.App.4th 555, 563 [29 Cal.Rptr.2d 463] [real estate broker].)

The trial court granted plaintiffs leave to amend their cause of action for constructive fraud, but plaintiffs did not do so. On appeal, they admit that "no denominated cause of action . . . purports to state the elements of constructive fraud," but they claim that the allegations of other causes of action have adequately stated a cause of action for constructive fraud. They further claim that the remedy for constructive fraud is cancellation of the deed restriction.

Civil Code section 3399 authorizes reformation of an instrument "[w]hen, through fraud or a mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties . . . ." The statute does not authorize reformation of a deed to reflect one party's unilateral mistake or misunderstanding if it was not shared by the other party. (*La Mancha Dev. Corp. v. Sheegog* (1978) 78 Cal.App.3d 9, 16 [144 Cal.Rptr. 59]; *Oates v. Nelson* (1969) 269 Cal.App.2d 18, 25 [74 Cal.Rptr. 475].) We see no adequate allegation that defendants ever intended to grant plaintiffs properties free of the deed restriction. Absent this allegation, the remedy of reformation is unavailable.

estate transfer disclosure statement. (Civ. Code, § 1102.6.)[20] It is fraud to suppress a fact with intent to induce a person to enter into a contract to acquire realty. (Civ. Code, §§ 1572, subd. 3, 1710, subd. 3; *Lingsch v. Savage, supra*, 213 Cal.App.2d 729, 735; *Curran v. Heslop* (1953) 115 Cal.App.2d 476, 480–481 [252 P.2d 378].)

■ What must be disclosed by a property seller is the fact or facts affecting the property's value. The seller is not required also to explain to the buyer why that fact affects the property's value. (*Sweat v. Hollister* (1995) 37 Cal.App.4th 603, 608–609 [43 Cal.Rptr.2d 399], disapproved on another ground in *Santisas v. Goodin* (1998) 17 Cal.4th 599, 609, fn. 5 [71 Cal.Rptr.2d 830, 951 P.2d 399] [once seller disclosed that residence was in flood plain, seller was not required to disclose effect of local ordinance on rebuilding or improving it]; *Assilzadeh v. California Federal Bank* (2000) 82 Cal.App.4th 399, 416 [98 Cal.Rptr.2d 176] ["The material fact that had to be disclosed was the fact that there was a lawsuit for defects, not each and every allegation contained within the court file."]; *Stevenson v. Baum* (1998) 65 Cal.App.4th 159, 165–166 [75 Cal.Rptr.2d 904] [once seller disclosed that mobilehome park was subject to recorded easements, seller was not required to disclose the location of an oil pipeline easement or how he had accommodated it].)

Reasonable or justifiable reliance on the nondisclosure is an element of such fraud. (*Lingsch v. Savage, supra*, 213 Cal.App.2d 729, 739.) " 'Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact.' " (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239 [44 Cal.Rptr.2d 352, 900 P.2d 601].)

"A breach of the duty to disclose gives rise to a cause of action for rescission or damages." (*Karoutas v. HomeFed Bank* (1991) 232 Cal.App.3d 767, 771 [283 Cal.Rptr. 809].) In this case, plaintiffs do not request rescission of their purchase contracts. "In fraud cases involving the 'purchase, sale or exchange of property,' the Legislature has expressly provided that the 'out-of-pocket' rather than the 'benefit-of-the-bargain' measure of damages should apply. ([Civ. Code,] § 3343, subds. (a), (b)(1).) This section does not apply, however, when a victim is defrauded by its fiduciaries. In this situation, the 'broader' measure of damages provided by [Civil Code] sections 1709 and 3333 applies." (*Alliance Mortgage Co. v. Rothwell, supra*, 10 Cal.4th at pp. 1240–1241, fns. omitted.) The parties have not discussed the measure of damages and how the recorded deed restriction affects the value of the properties which plaintiffs have received.

---

[20] Plaintiffs have not specifically alleged a violation of this statute. The complaints have not mentioned the existence or nonexistence of a real estate transfer disclosure statement.

South County's demurrer to the second amended complaint asserted that the seventh and ninth causes of action were vague and violated the particularity requirement for pleading fraud. South County elaborates on this contention on appeal.

As restated by *Robinson Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979, 993 [22 Cal.Rptr.3d 352, 102 P.3d 268], " '[i]n California, fraud must be pled specifically; general and conclusory allegations do not suffice. [Citations.] "Thus ' "the policy of liberal construction of the pleadings . . . will not ordinarily be invoked to sustain a pleading defective in any material respect." ' [Citation.] [¶] This particularity requirement necessitates pleading facts which 'show how, when, where, to whom, and by what means the representations were tendered.' " ' " (Cf. *Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC, supra*, 162 Cal.App.4th 858, 878.)

This statement of the rule reveals that it is intended to apply to affirmative misrepresentations. If the duty to disclose arises from the making of representations that were misleading or false, then those allegations should be described. (*Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC, supra*, 162 Cal.App.4th 858, 877–878.) However, as noted above (see fn. 18, *ante*, at p. 1381), plaintiffs have apparently abandoned their earlier claims of intentional and negligent misrepresentations. As plaintiffs accurately respond, it is harder to apply this rule to a case of simple nondisclosure. "How does one show 'how' and 'by what means' something didn't happen, or 'when' it never happened, or 'where' it never happened?"

We believe that certain observations made in the context of a class action are relevant here, where there are 38 plaintiffs. One of the purposes of the specificity requirement is "notice to the defendant, to 'furnish the defendant with certain definite charges which can be intelligently met.' " (*Committee on Children's Television, Inc. v. General Foods Corp., supra*, 35 Cal.3d 197, 216.) Less specificity should be required of fraud claims "when 'it appears from the nature of the allegations that the defendant must necessarily possess full information concerning the facts of the controversy,' [citation]; '[e]ven under the strict rules of common law pleading, one of the canons was that less particularity is required when the facts lie more in the knowledge of the opposite party . . . .' " (*Id.* at p. 217.) Also "considerations of practicality enter in" when multiple plaintiffs and defendants are involved. (*Ibid.*)

In this case, the plaintiffs may or may not know the names of all the corporate employees with whom they interacted. To afford defendants adequate notice of plaintiffs' claims, it does not appear necessary to require each of the 38 plaintiffs to allege each occasion on which an agent of either defendant could have disclosed the restrictive deed. Surely defendants have

records of their dealings with the plaintiffs. "Those details . . . are properly the subject of discovery, not demurrer." (*People ex rel. Sepulveda v. Highland Fed. Savings & Loan* (1993) 14 Cal.App.4th 1692, 1718 [19 Cal.Rptr.2d 555]; cf. *Charpentier v. Los Angeles Rams Football Co.* (1999) 75 Cal.App.4th 301, 312 [89 Cal.Rptr.2d 115].)

## A. *Constructive Notice, Inquiry Notice, and Actual Knowledge*

One of the central issues in this appeal is whether plaintiffs are chargeable with notice of the deed restriction at an earlier time than its disclosure in the grant deeds. As explained above, the recording of a deed restriction is ordinarily regarded as imparting constructive notice of its contents to subsequent purchasers. (Civ. Code, § 1213; *Anderson, supra*, 12 Cal.4th 345, 349, 355.) *Anderson, supra*, 12 Cal.4th 345, went on to state on page 355: "Constructive notice is 'the equivalent of *actual knowledge*; i.e., knowledge of its contents is conclusively presumed.' (4 Witkin, Summary of Cal. Law [(9th ed. 1987) Real Property], § 203, p. 408, italics in original.)"[21] Defendants rely on *Anderson* as establishing that plaintiffs had constructive notice and actual knowledge of the deed restriction by virtue of its recording and, by virtue of this knowledge, cannot successfully allege that defendants failed to disclose it.

There was a caveat in *Anderson*, however. " 'If future takers purchase a piece of property with notice of a restriction made by a predecessor, then, *in the absence of duress or fraud*, they may ordinarily be thought to have bargained for the property with the restriction in mind, and to have shown themselves willing to abide by it.' " (*Anderson, supra*, 12 Cal.4th at p. 366, italics added.)

Plaintiffs argue that the doctrine of constructive notice does not apply to fraud causes of action. *Bishop Creek Lodge v. Scira* (1996) 46 Cal.App.4th 1721 [54 Cal.Rptr.2d 745] (*Scira*) stated on page 1734: "Under a long line of cases, the fact that the victim had constructive notice of the truth from public records is no defense to fraud. The existence of such public records

---

[21] This quotation from Witkin is based on two cases. *Alhambra Redevelopment Agency v. Transamerica Financial Services* (1989) 212 Cal.App.3d 1370 [261 Cal.Rptr. 248] observed, "Here, it is undisputed the Flemings properly recorded the contract, thereby giving Transamerica constructive, if not actual notice of the contract." (*Id.* at p. 1377.) *Anderson v. Willson* (1920) 48 Cal.App. 289 [191 P. 1016] stated: "Without doubt, the presumption of notice thus raised by this code provision is conclusive and incontrovertible." (*Id.* at p. 293.) Both cases concluded that a person with constructive notice did not qualify as a bona fide purchaser without notice. Neither case attributed actual knowledge to the purchaser. At most, constructive notice has been conclusively presumed. As we proceed to explain in the text, there is a difference between actual and constructive notice.

may be relevant to whether the victim's reliance was justifiable, but it is not, by itself, conclusive. (*Seeger* v. *Odell* (1941) 18 Cal.2d 409, 414–417 [115 P.2d 977]; *Grange Co.* v. *Simmons* (1962) 203 Cal.App.2d 567, 576–577 [21 Cal.Rptr. 757]; *Gross* v. *Needham* (1960) 184 Cal.App.2d 446, 460 [7 Cal.Rptr. 664]; *Sullivan* v. *Dunnigan* (1959) 171 Cal.App.2d 662, 668 [341 P.2d 404]; *Regus* v. *Schartkoff* (1957) 156 Cal.App.2d 382, 389 [319 P.2d 721]; *Schaefer* v. *Berinstein* (1956) 140 Cal.App.2d 278, 296 [295 P.2d 113]; *Mills* v. *Hellinger* (1950) 100 Cal.App.2d 482, 487 [224 P.2d 34]; *Barder* v. *McClung* (1949) 93 Cal.App.2d 692, 697 [209 P.2d 808]; *Stoll* v. *Selander* (1947) 81 Cal.App.2d 286, 292 [183 P.2d 935]; *Anderson* v. *Thacher* (1946) 76 Cal.App.2d 50, 70 [172 P.2d 533].)" The rationale for this exception is, "The purpose of the recording acts is to afford protection not to those who make fraudulent misrepresentations but to *bona fide* purchasers for value." (*Seeger* v. *Odell, supra*, 18 Cal.2d at p. 415 (*Seeger*).) Defendants do not discuss this authority, cited by plaintiffs, in their briefs.

To see how this principle has been applied, we will review the 11 above cited cases to see which ones involved a claim that the plaintiffs should have learned of fraud in the purchase of sale or realty by virtue of recorded documents. Over half of them involved different facts.[22] Of the cases that involved the sale of real property, in *Mills v. Hellinger, supra*, 100 Cal.App.2d 482, the seller of property misrepresented the acreage to the buyer, who was entitled to rely on the seller's statements and was not deemed to know better from public records. (*Id.* at p. 487.) In *Barder v. McClung, supra*, 93 Cal.App.2d 692, the sellers of property told the buyer that the rear unit included a kitchen, without disclosing that they added the kitchen in violation of existing building restrictions and zoning regulations. The court held that the buyer was not "bound by constructive notice of the zoning ordinance," because the sellers had a duty "to disclose to plaintiff that the rear apartment was maintained and used in violation of existing zoning ordinances." (*Id.* at p. 697; cf. *Watt v. Patterson* (1954) 125 Cal.App.2d 788, 793 [271 P.2d 200] [property sellers are not required to disclose zoning regulations of which they are unaware and about which they have not misled buyers]; *City of West*

---

[22] *Seeger, supra*, 18 Cal.2d 409 (elderly couple induced to enter lease by attorney's misrepresentation that a mortgage on their property had been foreclosed and the property sold at an execution sale); *Gross v. Needham, supra*, 184 Cal.App.2d 446 (brother misrepresented to his younger half sister significance of deed they executed); *Sullivan v. Dunnigan, supra*, 171 Cal.App.2d 662 (son and daughter-in-law misrepresented to elderly mother significance of deed she executed); *Regus v. Schartkoff, supra*, 156 Cal.App.2d 382 (tort claimants were misled by insurance adjuster about applicable limitations period); *Schaefer v. Berinstein, supra*, 140 Cal.App.2d 278 (attorney engaged by city to clear title to tax-deed properties misrepresented to city the status of the sales and the buyers, who were straw men); *Stoll v. Selander, supra*, 81 Cal.App.2d 286 (corporate officer misappropriated corporation's property for himself); *Anderson v. Thacher, supra*, 76 Cal.App.2d 50 (real estate brokers misrepresented to plaintiffs the ownership and value of realty they were to obtain by exchange of realty).

*Hollywood v. Beverly Towers, Inc.* (1991) 52 Cal.3d 1184, 1194–1195 [278 Cal.Rptr. 375, 805 P.2d 329] [in the absence of fraud, property owners are presumed to have constructive notice of zoning ordinances affecting their properties without recording the ordinances under Gov. Code, § 27281.5].)

In *Grange Co. v. Simmons, supra,* 203 Cal.App.2d 567, the owners of a warehouse induced the Sahlmans to exchange their property for the warehouse by misrepresenting that the property was free and clear and the walls and roof would last a lifetime, and by suppressing the existence of (a) a deed allowing the builder of the warehouse to demand at any time that the roof be removed at the owners' expense and (b) a demand by the builder to remove the roof. (*Id.* at pp. 573–574.) The Sahlmans' real estate agents obtained a preliminary title report reflecting the recorded restrictive covenant, but did not advise the Sahlmans of the covenant before they signed off on the exchange. (*Id.* at pp. 572, 575.) The appellate court acknowledged that "the Sahlmans had constructive notice of the [title report]," but concluded that they were nevertheless justified in relying on the contrary representations of someone they were entitled to trust. (*Id.* at p. 576.) " 'The doctrine of constructive notice does not apply where there has been such a [false] representation of fact.' " (*Ibid.*)

Thus, in each of the above cases involving fraud in the sale of realty, there was an actual misrepresentation, not a mere nondisclosure, and the plaintiff was held not to have constructive notice of the falsity of the statement from a recorded document. *Stevenson v. Baum, supra,* 65 Cal.App.4th 159 distinguished *Seeger* as follows. "*Seeger* is a case of active, affirmative, intentional misrepresentation, not the mere alleged failure to disclose; moreover, *Seeger* did not involve facts which were just as accessible to the plaintiff as to the defendant." (*Id.* at pp. 166–167.) In none of the above cases was there evidence that the plaintiff had actual knowledge or notice of the existence of a recorded document contradicting the defendant's misrepresentation.

We believe that *Scira, supra,* 46 Cal.App.4th 1721 accurately describes the interaction of constructive and actual notice in a real estate fraud case. Unfortunately, the facts are somewhat involved. Several years before they opened escrow to sell a lodge, the owners told the ultimate buyer that the lodge had the exclusive right in the area to rent cabins and sell beer and gasoline. (*Id.* at p. 1728.) At that time, the owners were in litigation with some neighbors regarding the enforceability of this covenant. (*Id.* at p. 1727.) The neighbors had cross-complained to invalidate the covenant and filed a lis pendens. (*Ibid.*) After the buyer opened escrow on the lodge, he received a preliminary title report disclosing the restrictive covenant and the lis pendens. He asked the owners to clear the lis pendens from the title. (*Id.* at p. 1728.) They did so by entering a stipulated judgment declaring the covenant

unenforceable, after which the lis pendens was withdrawn. (*Ibid.*) The owners failed to disclose the terms of this judgment to the buyer, who sued the owners for fraud, among other causes of action. (*Id.* at pp. 1728–1729.) At the buyer's urging, the trial court initially excluded the lis pendens from evidence and ultimately instructed the jury that it did not provide the buyer with notice of the stipulated judgment. (*Id.* at pp. 1732–1733.)

The trial court's rulings were predicated on former statutes providing that, once the lis pendens was withdrawn, it provided neither actual nor constructive notice of its contents (now Code Civ. Proc., § 405.60), and further, that no person "shall be deemed to have actual knowledge of the action or any matter claimed, alleged, or contended therein, irrespective of whether such person actually possessed actual knowledge of the action or matter . . . ." (*Scira, supra*, 46 Cal.App.4th 1721, 1731–1732 & fns. 7, 8.)

Invoking the rule that constructive notice "as such, is irrelevant in a fraud action," the appellate court concluded that these statutes were likewise irrelevant. (*Scira, supra*, 46 Cal.App.4th at p. 1734.) If these statutes "applied in a fraud action, the plaintiff could purchase property after a lis pendens had been expunged or withdrawn and claim fraudulent misrepresentation or fraudulent nondisclosure of matter as to which he or she had actual knowledge." (*Id.* at p. 1735.) The court considered it manifestly unfair to exclude evidence of the plaintiff's actual knowledge. (*Ibid.*) The buyer complained that this imposed a duty of inquiry. The court responded: "Admittedly, in some cases, a fraud plaintiff's unreasonable failure to inquire into the truth may bar recovery. Nevertheless, a fraud plaintiff does not have the 'duty of inquiry' that a purchaser of real property does. The fraud plaintiff need only demonstrate justifiable reliance; this is a different, and far lower, standard. Thus, . . . a land purchaser who fails in his or her 'duty of inquiry' takes subject to prior interests such inquiry would have revealed; nevertheless, he or she may be able to recover for the seller's fraudulent misrepresentations regarding those interests." (*Ibid.*)

The appellate court concluded that excluding the evidence of the lis pendens was prejudicial. The owners were prepared to prove that it gave the buyer "actual knowledge" that the pending action might affect title to the property. "In light of the other evidence in the record, a jury could reasonably conclude that [the buyer] should have made a further inquiry or investigation into precisely how the lis pendens was cleared, and he was not justified in relying on the [owners'] failure to disclose." (*Scira, supra*, 46 Cal.App.4th at p. 1736.)

■ *Scira* thus differentiated constructive notice from actual knowledge and from inquiry notice. Actual notice is "express information of a fact . . . ."

(Civ. Code, § 18, subd. 1.) "Every person who has actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact, has constructive notice of the fact itself in all cases in which, by prosecuting such inquiry, he might have learned such fact." (Civ. Code, § 19; see *Pacific Trust Co. TTEE v. Fidelity Fed. Sav. & Loan Assn.* (1986) 184 Cal.App.3d 817, 825–826 [229 Cal.Rptr. 269] [subsequent encumbrancer had constructive notice, if not actual knowledge, of existence of prior recorded deed of trust and was on inquiry notice of the terms of the promissory note to which the deed referred].) *Scira* establishes that, though defrauded buyers will not be deemed to have constructive notice of public records, this does not insulate them from evidence of their actual knowledge of the contents of documents presented to them or from being charged with inquiry notice based on those documents.

### 1. The Significance of the Preliminary Title Reports

Plaintiffs have admitted receiving preliminary title reports that referred to the deed restrictions, though they alleged that these "references did not describe any limits on the sale value of their properties, or the ability of Plaintiffs to encumber their properties for financing." Defendants assert that these title reports gave plaintiffs actual notice of the deed restriction. The reports themselves are not in the joint appendix on appeal.

Since 1982, the Insurance Code has limited the significance of such preliminary reports. (*Southland Title Corp. v. Superior Court* (1991) 231 Cal.App.3d 530, 537 [282 Cal.Rptr. 425]; see *White v. Western Title Ins. Co.* (1985) 40 Cal.3d 870, 884 [221 Cal.Rptr. 509, 710 P.2d 309].) A preliminary title report is an offer "to issue a title policy subject to the stated exceptions set forth" therein. (Ins. Code, § 12340.11.) "The reports are not abstracts of title" and "shall not be construed as, nor constitute, a representation as to the condition of title to real property . . . ." (*Ibid.*) An " '[a]bstract of title' " is a written listing of "all recorded conveyances" affecting "the chain of title to the realty property described therein." (Ins. Code, § 12340.10.) The intent of these statutes is to relieve title insurers from liability as title abstractors for the negligent preparation of preliminary title reports. (Cf. *Southland Title Corp. v. Superior Court, supra,* 231 Cal.App.3d 530, 537–538.) These statutes do not make such reports meaningless. The reports serve to apprise the prospective insured of the state of title against which the insurer is willing to issue a title insurance policy. (*Ibid.*)

Despite these statutes, a purchaser who receives and reads a preliminary title report revealing the existence of a deed restriction has actual notice of its existence (cf. *Sain v. Silvestre* (1978) 78 Cal.App.3d 461, 470 [144 Cal.Rptr. 478], disapproved on another ground in *Reynolds Metals Co. v.*

*Alperson* (1979) 25 Cal.3d 124, 129 [158 Cal.Rptr. 1, 599 P.2d 83]) and is on inquiry notice of the nature of that restriction. Plaintiffs argue that, unlike Mr. Silvestre, they have not admitted they read the title reports, and therefore are not chargeable with actual knowledge of the existence of the deed restriction. In the absence of a claim that defendants somehow prevented them from reading the preliminary title reports or misled them about their contents, plaintiffs cannot blame defendants for their own neglect in reading the reports. A seller's nondisclosure of the state of a property's title, unaccompanied by affirmative misstatements about that title, should not blind a reasonably prudent buyer from reading a document that purports to describe the state of the title of the property he or she is about to acquire.

Plaintiffs have alleged that they received the title reports "at the time they purchased their property . . . ." It is not at all clear when plaintiffs claim to have purchased their properties. Plaintiffs assert that we must assume they received their reports at the close of escrow. However, this is not what they have alleged. They did allege that the deed restrictions were not disclosed in the grant deeds "until . . . close of escrow," but this language is not repeated regarding the preliminary title reports. The contracts of sale alleged here were not of the usual form, as plaintiffs' downpayments were effectively eight to 10 months of labor. The complaint does not clarify whether plaintiffs executed any documents prior to engaging in this labor that entitled them to ownership of properties at its culmination. The complaint does not give any dates for when any plaintiff purchased his or her property or received a preliminary title report.

In any event, there is no allegation that the preliminary title reports amounted to a disclosure by defendants. The reports therefore cannot have satisfied defendants' duty of disclosure of the deed restriction. They are relevant to whether plaintiffs justifiably relied on defendants' nondisclosure of the deed restriction, but we have not been presented with sufficient facts, including the timing of the reports, to resolve that question as a matter of law. They are also relevant to whether plaintiffs have timely filed fraud claims, an issue to which we turn our attention.

### 2. *The Statute of Limitations for Fraud or Mistake*

In demurring to the original complaint, CHISPA asserted, "the third cause of action, which sounds in fraud, is barred by the statute of limitations. The statute of limitations for a fraud based cause of action is three years. (Code Civ. Proc., § 338, subd. (d).)" "Here from the face of the complaint, it is clear that the action was brought more than three years after . . . defendants' alleged failure to disclose the deed restriction." South County joined in this demurrer. The ruling sustaining the demurrers did not specifically rely on the

statute of limitations. CHISPA reiterated this argument in its demurrer to the first amended complaint's allegations of fraudulent (10th cause of action) and negligent (11th cause of action) misrepresentation. South County did not assert the three-year limitations period in its written demurrer to the first amended complaint, but it did orally at the hearing on its demurrer. The ruling otherwise sustaining the demurrers overruled them on the statute of limitations grounds. CHISPA did not again reiterate its statute of limitations defense in demurring to the second amended complaint. South County has invoked the same statute of limitations in its demurrer to the second amended complaint and on appeal, although the demurrer directed this argument only to the 10th cause of action alleging negligent nondisclosure.

■ "When a ground for objection to a complaint, such as the statute of limitations, appears on its face or from matters of which the court may or must take judicial notice, a demurrer on that ground is proper." (*Cochran v. Cochran* (1997) 56 Cal.App.4th 1115, 1120 [66 Cal.Rptr.2d 337].) "[W]hen 'the relevant facts are not in dispute, the application of the statute of limitations may be decided as a question of law.' " (*Sahadi v. Scheaffer* (2007) 155 Cal.App.4th 704, 713 [66 Cal.Rptr.3d 517], quoting *International Engine Parts, Inc. v. Feddersen & Co.* (1995) 9 Cal.4th 606, 611–612 [38 Cal.Rptr.2d 150, 888 P.2d 1279].)

■ There is a three-year limitations period for: "An action for relief on the ground of fraud or mistake. The cause of action in that case is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." (Code Civ. Proc., § 338, subd. (d).) "It is necessary for a plaintiff to allege facts showing that suit was brought within a reasonable time after discovery of the fraud without unnecessary delay and that failure to make the discovery sooner was not due to negligence." (*Seeger, supra,* 18 Cal.2d 409, 418.) On appeal, plaintiffs concede that this is the limitations period applicable to their sixth, seventh, eighth, and ninth causes of action in their latest complaint.

The doctrine of inquiry notice is usually invoked when the issue is whether a statute of limitations has expired before a plaintiff should have discovered a cause of action. It has been applied to claims of fraud in the sale of realty. In *Henigan v. Yolo Fliers Club* (1930) 208 Cal. 697 [284 P. 906], a man purchased a tract of land amounting to 152.44 acres with the intent of subdividing it. He was told by an agent of the seller that if he purchased the 109.2 acres south of a fence on the property, the seller would give him 43.24 worthless acres north of the fence. (*Id.* at p. 701.) He purchased the property at a price of $210 per acre for each of the 152.44 acres, obtaining no donation of property. (*Id.* at p. 700.) He filed suit seeking damages for fraud over three years later.

The buyer argued that he was entitled to rely on the seller's statements and that constructive notice did not apply. (*Henigan v. Yolo Fliers Club, supra*, 208 Cal. at pp. 702–703.) The California Supreme Court rejected this contention as follows: "But the full application of this rule does not meet the issue here, for after consummation of the sale, facts abundant came to the notice of appellant that could not but have aroused an inquiry as to the true facts. The conscious fact that he had purchased 152.44 acres of land and paid the full price therefor and that no acreage appeared anywhere as donated land, either in the deed or in the map procured by him, and the further fact that, after subdivision, [he sold for value part of the worthless land], speaks eloquently to the effect that he knew waste area had been bought by him and was being offered for sale at a profit. These facts, in view of the finding of the court thereon, bring into operation the doctrine recognized by the case of *Tarke v. Bingham* [(1898)] 123 Cal. 163 [55 P. 759], where, in discussing the facts under the statute of limitations here involved, it was recognized that the rule contended for by appellant here would give way in cases where the facts meet the following test: 'The circumstances must be such that the inquiry becomes a duty, and the failure to make it a negligent omission.' " (*Id.* at p. 703.) The court further commented, "A visit to the land, or a perusal of the deed, consultation of the map, the knowledge of the acreage bought and the purchase price paid, the fixing of the values on the subdivisions of the tract or the totaling of the acreage in all the subdivisions, or a consideration of the question as to whether waste land was to be donated to purchasers from him would have brought home to plaintiff full knowledge of the facts upon which he urges fraud." (*Id.* at p. 702.) The court upheld a lower court finding that the action was barred by the statute of limitations.

As stated long ago in *Sisk v. Caswell* (1910) 14 Cal.App. 377 [112 P. 185]: "[A] party will not be permitted to plead ignorance of the covenants of a deed executed to him, after it has been accepted and recorded, as a ground for defeating the force and effect of such covenants. The presumptions are always in favor of the validity of a deed and its recitals. [¶] It is not, of course, claimed that the plaintiff fraudulently or otherwise prevented the defendant from giving the deed personal inspection and thus fully familiarizing himself with its precise provisions and covenants before he accepted and recorded it." (*Id.* at p. 390.) On the other hand, a buyer's failure to read a deed may be excused by justifiable reliance on a seller's misrepresentations. (*Kantlehner v. Bisceglia* (1951) 102 Cal.App.2d 1, 3 [226 P.2d 636].)

## B. *Applying the Law of Notice to Plaintiffs' Fraud Claims*

Applying the principles discussed above to this case, we reach the following conclusions. The recording of the affordable housing deed restriction served to bind subsequent purchasers, including plaintiffs. However, its

mere recording did not relieve defendants from their duty as sellers of realty to disclose its existence. The fact that residential property must remain affordable to those with very low to moderate incomes doubtless affects its value. Plaintiffs' constructive notice of the deed restriction by virtue of its recording does not preclude them from seeking damages based on the allegation that they were induced to labor for months by defendants' failure to disclose its existence.

All of the CHISPA grant deeds and two of the South County grant deeds did disclose the deed restriction by express reference to the recorded document. This gave plaintiffs actual knowledge of the existence of the deed restriction and inquiry notice of the nature of the restriction. Defendants were not required in the deeds to explain the impact of the deed restriction on marketability.

The grant deeds provided actual notice of the deed restriction. Plaintiffs do not allege that defendants either prevented them from reading the grant deeds or affirmatively misled them about their contents. This notice amounts to plaintiffs' discovery of the alleged fraud, at least as to those plaintiffs who received such deeds. (*Loeffler v. Wright* (1910) 13 Cal.App. 224, 231 [109 P. 269] [plaintiff is deemed to have actual notice of misrepresentations about contents of deed when he signed it]; cf. *Amtower v. Photon Dynamics, Inc.* (2008) 158 Cal.App.4th 1582, 1596 [71 Cal.Rptr.3d 361] [plaintiff had actual knowledge of omissions and misrepresentations in documents once he read them].) As summarized above (beginning on p. 1367, *ante*), the last of the grant deeds was issued on June 19, 2001. The original complaint was filed over three years later, on August 5, 2005. We conclude that the fraud claims by all plaintiffs other than those mentioned in footnote 9 (*ante*, at p. 1367) are barred by the statute of limitations.[23]

---

[23] In their petition for rehearing, plaintiffs who received grant deeds containing a reference to the deed restriction on resale price offer a new excuse for failing to discover the nature of this restriction. Those plaintiffs who are illiterate in English assert that "no person can receive actual notice of anything from a document written in a language the person cannot read." While the complaint alleged their illiteracy, plaintiffs did not argue in their briefs or at oral argument that illiteracy immunizes them from receiving notice from documents. As this court has stated, "a reviewing court need not consider points raised for the first time on petition for rehearing." (*CAMSI IV v. Hunter Technology Corp.* (1991) 230 Cal.App.3d 1525, 1542 [282 Cal.Rptr. 80].)

Moreover, this new argument lacks legal support. While the law is solicitous of those who are particularly susceptible to fraud due to their ignorance, age, or infirmity, illiterate adults are still expected to be prudent in their business transactions. (See *C. I. T. Corporation v. Panac* (1944) 25 Cal.2d 547, 559–560 [154 P.2d 710].) "[I]t is not unreasonable for the state to expect that persons such as those in plaintiffs' position will promptly arrange to have someone translate the contents of the notice" apparently pertaining to the person's right to receive

Plaintiffs seek to avoid this conclusion by asserting the relaxed discovery rule applicable to fiduciaries. "Although the general rules relating to pleading and proof of facts excusing a late discovery of fraud remain applicable, it is recognized that in cases involving such a [fiduciary] relationship facts which would ordinarily require investigation may not excite suspicion, and that the same degree of diligence is not required." (*Hobart v. Hobart Estate Co.* (1945) 26 Cal.2d 412, 440 [159 P.2d 958]; cf. *Alliance Mortgage Co. v. Rothwell, supra,* 10 Cal.4th 1226, 1240.)

A person in a fiduciary relationship may relax, but not fall asleep. "[I]f she became aware of facts which would make a reasonably prudent person suspicious, she had a duty to investigate further, and she was charged with knowledge of matters which would have been revealed by such an investigation." (*Miller v. Bechtel Corp.* (1983) 33 Cal.3d 868, 875 [191 Cal.Rptr. 619, 663 P.2d 177] [husband and wife].) Assuming for the sake of discussion that defendant nonprofit corporations were fiduciaries to plaintiffs and not just sellers of property, they disclosed the existence of a deed restriction in 13 of their grant deeds. If nothing earlier had alerted plaintiffs that they were not obtaining free and clear title to their properties, this gave them actual knowledge of the existence of the deed restriction and of defendants' prior nondisclosure of this condition.

---

welfare benefits. (*Guerrero v. Carleson* (1973) 9 Cal.3d 808, 814 [109 Cal.Rptr. 201, 512 P.2d 833].) Similarly, it would be prudent for an illiterate first-time homebuyer to get the help of a trusted person in reading and translating the documents seemingly essential to becoming a homeowner.

These plaintiffs offer to allege that defendants communicated with them orally and in writing exclusively in Spanish "except for the grant deeds, preliminary title reports, and other escrow documents." Civil Code section 1632, subdivision (b), requires that Spanish translations be provided for several kinds of documents for contracts or agreements that were negotiated primarily in Spanish, not including grant deeds.

Plaintiffs' petition for rehearing also clarifies that on the final pages of their reply brief, they intended, in admittedly "confusing phrasing," to ask for leave to amend so that all plaintiffs can allege causes of action for specific performance and damages based on the breach of a common provision in their promissory notes relating to their right to resell their residences.

"The general rule is that points raised for the first time in a reply brief will not be considered unless good cause is shown for the failure to present them before." (*Trustee Capital Wholesale Electric etc. Fund v. Shearson Lehman Brothers, Inc.* (1990) 221 Cal.App.3d 617, 627 [270 Cal.Rptr. 566].) Plaintiffs offer no explanation for failing to discover this language in their promissory notes, executed in 2000 and 2001, until after they filed their opening brief on appeal on August 15, 2007. Defendants have had no opportunity to brief this request, such as what limitations period is applicable, whether plaintiffs have shown diligence, and whether the new causes of action would relate back to the filing of the original complaint. Accordingly, we do not reach this request to order the trial court to grant leave to amend.

On the same reasoning, we do not reach plaintiffs' offer, in their petition for rehearing, to amend the complaint to allege that they were told about many deed restrictions, though not the resale restriction, in workshops put on by CHISPA before they undertook construction of their residences. Nor do we consider plaintiffs' three additional offers to allege a variety of other facts long known by them.

Plaintiffs also argue that a person holding legal title may bring an action to quiet title at any time that a "hostile claim is asserted in some manner to jeopardize the superior title." *Crestmar Owners Assn. v. Stapakis* (2007) 157 Cal.App.4th 1223, 1228 [69 Cal.Rptr.3d 231] explained, "the statute of limitations for an action to quiet title does not begin to run until someone presses an adverse claim against the person holding the property. (*Muktarian v. Barmby* (1965) 63 Cal.2d 558, 560 [47 Cal.Rptr. 483, 407 P.2d 659] . . . .)" This principle applies to plaintiffs' causes of action in their first amended complaint seeking to quiet their titles by invalidating the deed restriction. As we have explained above, for reasons other than the applicable statute of limitations, they have not stated a cause of action warranting that remedy.

"To determine the statute of limitations which applies to a cause of action it is necessary to identify the nature of the cause of action, i.e., the 'gravamen' of the cause of action. [Citations.] '[T]he nature of the right sued upon and not the form of action nor the relief demanded determines the applicability of the statute of limitations under our code.' " (*Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 22–23 [32 Cal.Rptr.2d 244, 876 P.2d 1043].)

Plaintiffs' quiet title causes of action are premised on the illegality, invalidity, and unenforceability of the recorded deed restriction. In contrast, the gravamen of their fraud causes of action is that defendants breached a duty to disclose before plaintiffs acquired their properties that the properties' market value would be depressed by an effective and valid deed restriction. "The question is: Was the discovery of the fraud, as a matter of law, made more than three years prior to commencement of the action?" (*Henigan v. Yolo Fliers Club, supra*, 208 Cal. 697, 704.) We conclude, as a matter of law, that those plaintiffs who received actual notice of the deed restriction in their grant deeds discovered defendants' alleged fraud at the time they received their deeds, over three years before their original complaint was filed. Their remaining in possession of the property does not excuse their failure to file the complaint earlier.

As to those plaintiffs who did not receive grant deed notice of the recorded deed restriction, it does not appear from the face of the second amended complaint and facts subject to judicial notice that the limitations period has lapsed on their fraud claims. We conclude that they may be entitled to damages, though not invalidation of the deed restriction, if they can prove that they were induced to perform labor for months by South County's failure to disclose the deed restriction.

## X. ALLEGED BREACH OF IMPLIED CONTRACT

In the second amended complaint, plaintiffs alleged that they entered implied unwritten contracts with CHISPA (fourth cause of action) and South

County (third and fifth causes of action) including the terms that, if plaintiffs contributed their time and labor to construct their homes and assumed the necessary indebtedness, defendants "would convey to Plaintiffs title to the homes free from [a] restriction prohibiting Plaintiffs from selling their homes at fair market value." Plaintiffs fully performed their obligations under these contracts. By providing grant deeds subject to the recorded deed restriction, defendants breached these implied contracts. Plaintiffs requested either specific performance of this covenant or damages.

■ Although the statute of frauds requires agreements for the sale of real property to be in writing (Civ. Code, § 1624, subd. (a)(3)), plaintiffs have alleged that they fully performed their obligations under their implied contracts. "The doctrine of part performance by the purchaser is a well-recognized exception to the statute of frauds as applied to contracts for the sale or lease of real property." (*Sutton v. Warner* (1993) 12 Cal.App.4th 415, 422 [15 Cal.Rptr.2d 632].)

South County demurred to the third cause of action based on the two-year statute of limitations applicable to "[a]n action upon a contract, obligation or liability not founded upon an instrument of writing . . . ." (Code Civ. Proc., § 339, subd. 1.)[24] It reiterates this contention on appeal. CHISPA also makes this contention on appeal, although it was not asserted in its demurrer.

As this court explained in *B & P Development Corp. v. City of Saratoga, supra*, 185 Cal.App.3d at page 959: "An appellate court may . . . consider new theories on appeal from the sustaining of a demurrer to challenge or justify the ruling. As a general rule a party is not permitted to change its position on appeal and raise new issues not presented in the trial court. [Citation.] This is particularly true 'when the new theory depends on controverted factual questions whose relevance thereto was not made to appear' in the trial court. [Citation.] However, 'a litigant may raise for the first time on appeal a pure question of law which is presented by undisputed facts.' [Citations.] A demurrer is directed to the face of a complaint (Code Civ. Proc., § 430.30, subd. (a)) and it raises only questions of law (Code Civ. Proc., § 589, subd. (a); [citation]). Thus an appellant challenging the sustaining of a

---

[24] The same two-year limitations period applies to "[a]n action based upon the rescission of a contract not in writing. The time begins to run from the date upon which the facts that entitle the aggrieved party to rescind occurred. Where the ground for rescission is fraud or mistake, the time does not begin to run until the discovery by the aggrieved party of the facts constituting the fraud or mistake." (Code Civ. Proc., § 339, subd. 3.) As we have already observed, plaintiffs are not requesting rescission of their purchase contracts.

Plaintiffs assert that this shorter statute of limitations applies to their purported 10th cause of action alleging that South County was negligent in failing to learn of or disclose the existence of the deed restriction. As we have explained above (see fn. 17, *ante*, at p. 1381), we interpret this cause of action as arising in fraud, so it is subject to the longer statute of limitations.

general demurrer may change his or her theory on appeal [citation], and an appellate court can affirm or reverse the ruling on new grounds. [Citations.] After all, we review the validity of the ruling and not the reasons given. [Citation.]"

Just as we have concluded that most plaintiffs are deemed to have discovered the fraudulent nondisclosure when they received grant deeds disclosing the deed restriction, we conclude that the dates of those grant deeds are when their cause of action for breach of an implied contract accrued, which was well over two years before the action was filed.

Plaintiffs seek to avoid this shorter limitations period by the same arguments made and rejected above. They assert that they did not discover these breaches until plaintiff Rebecca Pineda was told about the deed restriction in April 2004. However, the discovery rule is generally inapplicable to alleged breaches of contract unless there is a breach of fiduciary duty. (*Krieger v. Nick Alexander Imports, Inc.* (1991) 234 Cal.App.3d 205, 221–222 [285 Cal.Rptr. 717]; *April Enterprises, Inc. v. KTTV* (1983) 147 Cal.App.3d 805, 826–832 [195 Cal.Rptr. 421].) Even assuming the discovery rule applies to fiduciary relationships, we again deem plaintiffs to have discovered the breach of this implied contract when they received their grant deeds. As above, this conclusion about the statute of limitations does not eliminate the claims for breach of implied contract by those plaintiffs identified in footnote 9 (*ante*, p. 1367).

■■■ CHISPA demurred to this cause of action for uncertainty in failing to allege whether the contract was express or implied. "If the complaint sets forth a cause of action upon a contract, express or implied, it cannot be attacked for ambiguity or uncertainty . . . ." (*Hale Bros. v. Milliken* (1904) 142 Cal. 134, 138 [75 P. 653].) The complaint clearly alleged that plaintiffs are relying on an implied, wordless promise to convey a restriction-free grant deed. While we may doubt that plaintiffs will be able to prove the existence of implied terms that conflict with express contractual terms (cf. *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 374 [6 Cal.Rptr.2d 467, 826 P.2d 710]), plaintiffs have so far avoided alleging, apart from the grant deeds and promissory notes, the express terms of their agreements to obtain real property in exchange for their labor. This alleged uncertainty affords no basis to sustain a demurrer to these claims of breach of implied contracts.

## XI. Disposition

The appeal is dismissed as to the County of Monterey. The judgment of dismissal is reversed as to South County. The order of November 9, 2006, sustaining the demurrer by CHISPA to the second amended complaint is upheld. The order sustaining the demurrer of South County to the second amended complaint is overruled only as to the third, fifth, seventh, ninth and 10th causes of action alleged by plaintiffs Jose and Carmen Cervantes, Fermin and Rosario Chavarin, Juventino and Socorro Chavez, Roberto Alfaro, Jose and Rebecca Pineda, Tomas and Patricia Alfaro, Manuel Castro, Octavio Martinez, Erendira Sanchez, Hector Mendoza, and Herlinda Rodriguez. The parties will bear their own costs on appeal.

Premo, J., and Bamattre-Manoukian, J., concurred.

A petition for a rehearing was denied March 18, 2009, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied May 13, 2009, S171630.